## IN THE UNITED STATES DISTRICT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

STEPHANIE NELSON AND ASHLEY BRYMER, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

      Plaintiffs,

v.

ENT CREDIT UNION

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

## CLASS ACTION COMPLAINT

Plaintiffs, Stephanie Nelson, and Ashley Brymer, individually and on behalf of the classes of persons preliminarily defined below, make the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Plaintiffs bring this action on behalf of themselves and classes of all similarly situated consumers against Defendant, Ent Credit Union ("ENT"), arising from its routine practices of (a) assessing Overdraft Fees ("OD Fees") on transactions that did not actually overdraw the account; and (b) charging two or three non-sufficient funds fees ("NSF Fee") on a single transaction.

2.      ENT misleadingly and deceptively misrepresents each of the above practices, including in its own account contracts.  ENT also omits material facts pertaining to each of the above practices, including in its account contracts.

3.      This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief.

4.      As described herein, Defendant's practices violate Colorado statutory and common law, as well as the Defendant's own form contracts.

5.      Defendant's improper scheme to extract funds from account holders has victimized Plaintiffs and hundreds of other similarly situated consumers.  Unless enjoined, Defendant will continue to engage in these schemes and continue to cause substantial injury to its consumers.

## PARTIES

6.      Plaintiff Stephanie Nelson is an individual and resident of Tarrant County, Texas.

7.      Plaintiff Ashley Brymer is an individual and resident of El Paso, County, Colorado.

8.      Defendant, ENT, is a Colorado corporation located at 7250 Campus Drive, Colorado Springs, CO 80920.  Defendant is one of Colorado's largest credit unions.  It has over $5 billion in assets and maintains several branches throughout Colorado.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of

interest and costs, and at least one of the members of the proposed class is a citizen of a different state than the Defendant.

10.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because Defendant is subject to personal jurisdiction here and conducts business in Colorado and because a substantial part of the events or omission giving rise to the claims asserted herein occurred in this district.

## BACKGROUND FACTS

## I.    ENT CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

### A.    Overview of Claim

11.    Plaintiffs bring this cause of action challenging ENT's practice of charging overdraft fees on what is referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

12.    Here's how it works.  At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, ENT immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount.  As a result, customers' accounts will always have sufficient funds available to cover these transactions because ENT has already sequestered these funds for payment.

13.    However, ENT still assesses crippling $25 OD Fees on many of these transactions and mispresents its practices in its account documents.

14.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, ENT later assesses OD Fees on those same transactions

when they purportedly settle days later into a negative balance.  These types of transactions are APPSN transactions.

15.    ENT maintains a running account balance in real time, tracking funds consumers have for immediate use.  This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made.  When a customer makes a purchase with a debit card, ENT sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance.  Such funds are not available for any other use by the account holder, and such funds are specifically associated with a given debit card transaction.

16.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold."  During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

17.    That means when any *subsequent*, intervening transactions are initiated on a checking account; they are compared against an account balance that has already been reduced to account for any earlier debit card transactions.  This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

18.     Still, despite keeping those held funds off-limits for other transactions, ENT improperly charges OD Fees on those APPSN Transactions, although the APPSN transactions *always* have sufficient available funds to be covered.

19.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.  Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above.  Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed.  They therefore could not reasonably avoid incurring the overdraft fees charged.  Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status.  But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures.  Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive.  Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

20.    There is no justification for these practices, other than to maximize ENT's overdraft fee revenue.  APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance.  But ENT is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.  But ENT was not content with these millions in OD Fees.  Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

21.    Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in ENT's adhesion contracts—contracts which fundamentally misconstrue and mislead consumers about the true nature of ENT's processes and practices.  These practices also exploit contractual discretion to gouge consumers.

22.    In plain, clear, and simple language, the checking account contract documents covering overdraft fees promise that ENT will only charge overdraft fees on transactions that have insufficient funds to cover that transaction.

23.    In short, ENT is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.    Mechanics of a Debit Card Transaction**

24.    A debit card transaction occurs in two parts.  First, authorization for the purchase amount is instantaneously obtained by the merchant from ENT.  When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to ENT, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

25.     At this step, if the transaction is approved, ENT immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

26.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

27.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### C.     ENT's Account Contract

28.     Plaintiffs have ENT checking accounts, which are currently governed by ENT's standardized "Member Service Agreement" document ("Deposit Agreement").

29.     The Deposit Agreement and relevant contract documents covering overdraft fees provide that ENT will not charge OD Fees on transactions that have sufficient funds to cover them at the time they are initiated.

30.     ENT promises that "available" fund is the balance used to determined overdrafts; and that immediate holds are placed on available funds for debit card transactions, at the moment of authorization:

> If on any day, the available funds in your checking or savings account are not sufficient to cover checks, fees or other items posted to your account, those amounts will be handled in accordance with our overdraft procedures or an overdraft protection plan you have with us. Our determination of an insufficient available account balance may be made at any time between presentation and our midnight deadline (of the same day) with only one review of the account required. We have no duty to notify you of an insufficient funds check or item. Your account will then be subject to a charge for the check or item whether paid or returned and any subsequent overdraft processing costs as set forth in the Fee Schedule.

*      *      *

Transaction Authorizations. Authorization holds may reduce the amount available in your account. Ent has no control over the dollar amount and time that a merchant authorization holds your available funds. You agree that we shall not be liable for withholding any authorization. The actual or ledger balance indicates the items that have actually posted to your account but not transactions that have been authorized and are pending. As an example, any purchases, holds, fees, other charges or deposits made on your account that have not yet posted will not appear in your actual or ledger balance. **Your available account balance is the amount of money in your account that is available to you to use without incurring a non-sufficient funds (NSF) or courtesy pay (overdraft) fee**. The available account balance takes into account things like holds placed on deposits, pending transactions (such as pending debit card purchases) that have been authorized for the merchant but not posted to your account, authorized automatic bill payments and other outstanding transactions that have not posted to your account. This available balance is the balance used to determine if items are subsequently presented against insufficient funds or the amount that would overdraw your account and incur fees.

Exhibit A, Deposit Agreement, 4 (emphasis added).

31.     Via this provision of the Deposit Agreements, ENT promises that it uses available balance—the same balance that is immediately reduced when a debit card transaction is authorized—to determine whether an overdraft occurs, and a fee is assessed.

32.     It also promises that available balance in the amount that can be "used" without incurring a fee.

33.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet ENT assesses OD Fees on them anyway.

34.     The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APPSN Transactions.

35.     In fact, ENT actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to "post" those same transactions.  Instead, it uses a secret posting process described below.

36.     All the above representations and contractual promises are untrue.  In fact, ENT charges OD Fees even when sufficient funds exist to cover transactions that are "authorized" into a positive balance.  No express language in any document states that ENT may impose overdraft fees on any APPSN Transactions.

37.     The account documents misconstrue ENT's true debit card processing and overdraft practices.

38.     First, and most fundamentally, ENT charges overdraft fees on debit card transactions for which there are sufficient funds available to "use" to cover the transactions.

39.     ENT assesses OD Fees on APPSN Transactions that ***do*** have sufficient funds available to cover them throughout their lifecycle.

40.     ENT's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so.  This discrepancy between ENT's actual practice and the contract causes consumers like Plaintiffs to incur more overdraft fees than they should.

41.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

42.     Because these withdrawals take place upon initiation, they cannot be re-debited later.  But that is what ENT does when it re-debits the account during a secret batch posting process.

43.     In reality, ENT's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

44.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, ENT cannot then charge an overdraft fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

45.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, ENT does something new and unexpected, during the middle of the night, during its nightly batch posting process.  Specifically, ENT releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

46.     This secret step allows it to charge overdraft fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which ENT specifically set aside money to pay them.

47.     This discrepancy between ENT's actual practices and the contract causes consumers to incur more overdraft fees than they should.

48.     In sum, there is a huge gap between ENT's practices as described in the account documents and ENT's practices in reality.

**D.**     <u>**ENT Abuses Contractual Discretion**</u>

49.     ENT's treatment of debit card transactions to charge overdraft fees is not simply a breach of the express terms of the numerous account documents.  In addition, ENT exploits contractual discretion to the detriment of account holders when it uses these policies.

50.     The term "to cover" a transaction is undefined. ENT uses its discretion to define "to cover" in a manner contrary to any reasonable, common sense understanding of that term.  In ENT's implied definition, a balance is insufficient to "cover" a transaction even if ENT sequesters sufficient available funds for that transaction at the time it is made.

51.     Moreover, ENT uses its contractual discretion to cause APPSN Transactions to incur overdraft fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

52.     ENT uses all of these contractual discretion points unfairly to extract overdraft fees on transactions that no reasonable consumer would believe could cause overdraft fees.

**E.**     <u>**Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately**</u>

53.     The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions.  That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

54.     ENT was and is aware that this is precisely how account holders reasonably understand debit card transactions to work.

55.     ENT knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device; because they don't allow debt like credit cards do; and because the money comes directly out of a checking account.

56.     Consumer Action, a national nonprofit consumer education, and advocacy organization advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account.  Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *See* https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited March 3, 2019).

57.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending.  When you use a debit card, you do not get a monthly bill.  You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *See* http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited March 3, 2019).

58.     That is a large part of the reason that debit cards have risen in popularity.  The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with

credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[1]

59.    Not only have consumers increasingly substituted from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

60.    ENT was aware of a consumer perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

### F.    The Named Plaintiffs' Debit Card Transactions

61.    Ms. Nelson's account was assessed a $25 OD Fee on a debit card transaction on August 26, 2018, for a transaction that settled that day.  However, that transaction was authorized into a <u>positive</u> account balance prior to August 26, 2018.  The same fact pattern occurred on September 16, 2018; October 3, 2018; and January 19, 2019.

62.    Likewise, Ms. Brymer's account was assessed a $25 OD Fee on a $6.51 debit card transaction from Sonic restaurant on March 22, 2018, for a transaction that settled that day. However, that transaction was authorized into a <u>positive</u> account balance prior to March 22, 2018.  The same fact pattern occurred with respect to two debit card transactions for which she was assessed OD Fees on July 31, 2018.

---

[1]  Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23    (last visited March 3, 2019).

## II.  ENT CHARGES TWO OR MORE NSF FEES ON THE SAME ITEM

63.    As alleged more fully herein, ENT's Account Documents allow it to take certain steps when an account holder attempts a transaction but does not have sufficient funds to cover it.  Specifically, ENT may (a) authorize the transaction and charge a *single* $25 OD Fee; or (b) reject the transaction and charge a *single* $25 NSF Fee.

64.    In contrast to its Account Documents, however, ENT regularly assesses two or more NSF Fees on the *same* item or transaction.

65.    This abusive practice is not universal in the financial services industry.  Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one NSF Fee on the same item when it is reprocessed.  Instead, Chase charges one NSF Fee even if a transaction is resubmitted for payment multiple times.

66.    ENT's Account Documents never disclose this practice.  To the contrary, ENT's Account Documents indicate it will only charge a single NSF Fee on an item or per transaction.

### A.    The Named Plaintiffs' Experiences

67.    In support of their claims, Plaintiffs offer examples of NSF Fees that should not have been assessed against their checking accounts.  As alleged below, ENT: (a) reprocessed a previously declined transaction; and (b) charged a fee upon reprocessing.

68.    On December 3, 2018, Plaintiff Nelson attempted an ACH payment to her cable company.

69.    ENT rejected payment of that transaction due to insufficient funds in Plaintiff Nelson's account and charged her a $25 NSF Fee for doing so.  Plaintiff does not dispute the initial fee, as it is allowed by ENT's Account Documents.

70.     Unbeknownst to Plaintiff Nelson and without her request to ENT to retry the transaction, however, four days later, on December 7, 2018, ENT processed the same transaction yet again, and again ENT rejected the transaction due to insufficient funds and charged Plaintiff Nelson *another* $25 NSF Fee.

71.     That is not all.  Unbeknownst to Plaintiff Nelson and without her request to ENT to retry the transaction, however, seven more days later, on December 14, 2018, ENT processed the same transaction yet again, and again ENT rejected the transaction due to insufficient funds and charged Plaintiff *another* $25 NSF Fee.

72.     *In sum, ENT charged Plaintiff Nelson $75 in fees to attempt to process a single electronic payment.*

73.     Plaintiff Nelson understood the payment to be a single transaction as is laid out in the ENT contract, capable at most of receiving a single NSF Fee (if ENT returned it) or a single OD Fee (if ENT paid it).

74.     Similarly, on July 10, 2018, Plaintiff Brymer attempted a $27 electronic payment on her credit card.

75.     ENT rejected payment of that transaction due to insufficient funds in Plaintiff Brymer's account and charged her a $25 NSF Fee for doing so.  Plaintiff Brymer does not dispute the initial fee, as it is allowed by ENT's Account Documents.

76.     Unbeknownst to Plaintiff Brymer and without her request to ENT to retry the transaction, however, the next day, on July 11, 2018, ENT processed the same transaction yet again, and again ENT rejected the transaction due to insufficient funds and charged Plaintiff Brymer *another* $25 NSF Fee.

77. *In sum, ENT charged Plaintiff Brymer $50 in fees to attempt to process a single electronic payment for far less than that amount.*

78. Plaintiff Brymer understood the payment to be a single transaction as is laid out in the ENT contract, capable at most of receiving a single NSF Fee (if ENT returned it) or a single OD Fee (if ENT paid it).

79. Likewise, on February 6, 2018, Plaintiff Brymer attempted a payment of $206.66.

80. ENT rejected payment of that transaction due to insufficient funds in Plaintiff Brymer's account and charged her a $25 NSF Fee for doing so. Plaintiff Brymer does not dispute the initial fee, as it is allowed by ENT's Account Documents.

81. Unbeknownst to Plaintiff Brymer and without her request to ENT to retry the transaction, however, seven days later, on February 13, 2018, ENT processed the same transaction yet again, and again ENT rejected the transaction due to insufficient funds and charged Plaintiff Brymer *another* $25 NSF Fee.

82. *In sum, ENT charged Plaintiff Brymer $50 in fees to attempt to process a single electronic payment.*

83. Plaintiff Brymer understood the payment to be a single transaction as is laid out in the ENT contract, capable at most of receiving a single NSF Fee (if ENT returned it) or a single OD Fee (if ENT paid it).

84. The same fact pattern occurred with a $25 credit card payment on October 2 and October 5, 2018.

**B.     The Imposition of Multiple NSF Fees on a Single Transaction Violates ENT's Express Promises and Representations**

85.     The Deposit Agreement provides the general terms of Plaintiffs' relationship with the Credit Union, and therein ENT makes explicit promises and representations regarding how transactions will be processed, as well as when NSF Fees and OD Fees may be assessed.

86.     The Deposit Agreement contains explicit terms indicating that NSF Fees will only be assessed once per transaction or item—defined as a customer request for payment or transfer—when in fact ENT regularly charges two or more NSF Fees per transaction or item even though a customer only requested the payment or transfer once.

87.     ENT's Account Documents indicate that a singular NSF Fee can be assessed on checks, ACH debits, and electronic payments.

88.     ENT's Account Documents state that it will charge $25 per item or transaction that is returned due to insufficient funds.

89.     According to the Fee Schedule, Non-Sufficient Funds (NSF Item*) $30.00

    *Check, substitute check, or electronic item.

Exhibit B, Fee Schedule.

90.     That is important because according to the Deposit Agreement, a single fee will be assessed on such items:

    Checks, transfer orders or payment orders that are drawn against insufficient funds will be subject to a fee, set forth in the Fee Schedule.

Exhibit A, Deposit Agreement, 3.

91.    The same "check" or "electronic item" on an account cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiffs took no action to resubmit them.

92.    There is zero indication anywhere in the Account Documents that the same "check" or "electronic item" is eligible to incur multiple NSF Fees.

93.    Even if ENT reprocesses an instruction for payment, it is still the same "check" or "electronic item."  Its reprocessing is simply another attempt to effectuate an account holder's original order or instruction.

94.    The disclosures described above never discuss a circumstance where ENT may assess multiple NSF Fees for a single check or ACH transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

95.    In sum, ENT promises that one $25 NSF Fee will be assessed per electronic payment or check, and these terms must mean all iterations of the same instruction for payment. As such, ENT breached the contract when it charged more than one fee per item.

96.    Reasonable consumers understand any given authorization for payment to be one, singular "check" or "electronic item," as those terms are used in ENT's Account Documents.

97.    Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which it will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account.  Nowhere does ENT disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor do ENT customers ever agree to such fees.

98.     Customers reasonably understand, based on the language of the Deposit Agreement and ENT's other Account Documents, that its reprocessing of checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger NSF Fees.  In other words, it is always the same item or transaction.

99.     Banks and credit unions like ENT that employ this abusive practice know how to plainly and clearly disclose it.  Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their account holders—something Defendant here never did.

100.     For example, First Citizens Bank, a major institution in the Carolinas, engages in the same abusive practice as ENT, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**. All fees are charged during evening posting.  When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

First Citizens Bank Deposit Account Agreement, Fees for NSF Items (emphasis added).

101.     First Hawaiian Bank engages in the same abusive practices as Defendant, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

Terms and Conditions of FHB Online Services – First Hawaiian Bank, Amendment of Terms and Conditions Bill Payment Service, ¶13 (September 2018) (emphasis added).

102.     Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account.  We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.

Klein Bank Consumer and Small Business Online Access Agreement, Bill Pay Service ¶H.

103.    ENT provides no such disclosure, and in so doing, deceives its account holders.

### C.    The Imposition of Multiple NSF Fees on a Single Transaction Breaches ENT's Duty of Good Faith and Fair Dealing

104.    Parties to a contract are required not only to adhere to the express conditions in the contract but also to act in good faith when they are invested with a discretionary power over the other party.  In such circumstances, the party with discretion is required to exercise that power and discretion in good faith.  This creates an implied promise to act in accordance with the parties' reasonable expectations and means that ENT is prohibited from exercising its discretion to enrich itself and gouge its customers.  Indeed, ENT has a duty to honor transaction requests in a way that is fair to Plaintiffs and its other customers and is prohibited from exercising its discretion to pile on even greater penalties on the depositor.  Here—in the adhesion agreements ENT foisted on Plaintiffs and its other customers—ENT has provided itself numerous discretionary powers affecting customers' credit union accounts.  But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, ENT abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

105.    ENT exercises its discretion in its own favor—and to the prejudice of Ms. Nelson and Ms. Brymer and its other customers—when it reprocesses a transaction when it knows a customer's account lacks funds and then charges additional NSF Fees on a single item.  Further, ENT abuses the power it has over customers and their accounts and acts contrary to their reasonable expectations under the Deposit Agreement.  This is a breach of ENT's implied covenant to engage in fair dealing and act in good faith.

106.    Further, ENT maintains complete discretion not to assess NSF Fees on transactions at all.  As alleged in the previous paragraph, "a fee may be assessed" or "we may charge you a non-sufficient funds (NSF) fee."  By exercising its discretion in its own favor—and to the prejudice of Plaintiffs and other customers—by charging more than one NSF Fee on a single item, ENT breaches the reasonable expectation of Plaintiffs and other customers and in doing so violates the implied covenant to act in good faith.

107.    It was bad faith and totally outside Plaintiffs' reasonable expectations for ENT to use its discretion to assess two or three NSF Fees for a single attempted payment.

108.    When ENT charges multiple NSF Fees, ENT uses its discretion to define the meaning of "writing" a "check" and "electronic transaction" in an unreasonable way that violates common sense and reasonable consumer expectations.  ENT uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more NSF Fees.

109.    Moreover, ENT provides itself discretion to refuse to reprocess transactions that are initially rejected.  It abuses that discretion to repeatedly resubmit transactions and to charge fees each time.

## CLASS ACTION ALLEGATIONS

110.    Description of the Classes:    Plaintiffs bring this class action on behalf of themselves and classes of persons ("the Classes") defined as follows:

> All consumers who, during the applicable statute of limitations, were charged OD Fees on debit card transactions that did not overdraw an ENT checking account (the "National APPSN Class") (Proposed class representatives: Plaintiff Nelson and Plaintiff Brymer)

> All consumers who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item on an ENT checking account (the "National Multiple NSF Class") (Proposed class representatives: Plaintiff Nelson and Plaintiff Brymer)

> All consumers in the state of Colorado who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item on an ENT checking account (the "Colorado Multiple NSF Class") (Proposed class representative: Plaintiff Brymer)

111.    Excluded from the Classes are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.    Also excluded from the Classes are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

112.    The time period for each of the Classes is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as the ENT remedy the conduct complained of herein.

113.    Numerosity:    The members of the proposed Classes are so numerous that individual joinder of all members is impracticable.    The exact number and identities of the members of the proposed Classes are unknown at this time and can be ascertained only through

appropriate discovery.  Plaintiffs estimate the number of members in each Class to be in the thousands.

114.   <u>Common Questions of Law and Fact Predominate</u>:  There are many questions of law and fact common to Plaintiffs and the Classes, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include:

A.     Whether ENT charged OD Fees on transactions that did not overdraw an account and whether it charged multiple NSF Fees on a single transaction;

B.     Whether ENT breached its own contract by charging OD Fees on transactions that did not overdraw an account and whether it charged multiple NSF Fees on a single transaction;

C.     Whether ENT breached the covenant of good faith and fair dealing;

D.     Whether ENT was unjustly enriched;

E.     The proper method or methods by which to measure damages; and

F.     The declaratory and injunctive relief to which the Classes are entitled.

115.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and all members of the Classes have been similarly affected by the actions of Defendant.

116.   <u>Adequacy of Representation</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs have retained counsel with substantial experience in prosecuting complex and consumer class action litigation.  Plaintiffs and their counsel are

committed to vigorously prosecuting this action on behalf of the Classes and have the financial

resources to do so.

117.    <u>Superiority of Class Action</u>:  Plaintiffs and the members of the Classes suffered,

and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct.  A

class action is superior to other available methods for the fair and efficient adjudication of the

present controversy.  Individual joinder of all members of the Classes is impractical.  Even if

individual Class members had the resources to pursue individual litigation, it would be unduly

burdensome to the courts in which the individual litigation would proceed. Individual litigation

magnifies the delay and expense to all parties in the court system of resolving the controversies

engendered by Defendant's common course of conduct.  The class action device allows a single

court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable

handling of all class members' claims in a single forum.  The conduct of this action as a class

action conserves the resources of the parties and of the judicial system and protects the rights of

the Class members.

118.    <u>Risk of Inconsistent or Varying Adjudication</u>:  Class action treatment is proper,

and this action should be maintained as a class action because the risks of separate actions by

individual members of the Classes would create a risk of: (a) inconsistent or varying

adjudications with respect to individual Class members which would establish incompatible

standards of conduct for the ENT as the parties opposing the Classes; and/or (b) adjudications

with respect to individual Class members would, as a practical matter, be dispositive of the

interests of other Class members not party to the adjudication or would substantially impair or

impede their ability to protect their interests.

119. <u>Action Generally Applicable to Class as a Whole</u>: ENT, as the party opposing the Classes, has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of All Classes)**

120. Plaintiffs incorporate by reference the preceding paragraphs.

121. Plaintiffs and ENT have contracted for banking services, as embodied in ENT's account documents and related documentation.

122. All contracts entered by Plaintiffs and the Classes are identical or substantively identical because ENT's form contracts were used uniformly.

123. ENT has breached the express terms of their own agreements as described herein.

124. Under the law of states where ENT does business, good faith is an element of every contract. All contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

125. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of

the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

126.    ENT abused the discretion it granted to itself when it charged OD Fees on transactions that did not overdraw an account and when it charged more than one NSF Fee on a single item.

127.    In these and other ways, Defendant violated good faith and fair dealing.

128.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing revenue from Plaintiffs and other members of the Classes.

129.    Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the agreements.

130.    Plaintiffs and members of the Classes have sustained damages as a result of Defendant's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Colorado Consumer Protection Law**
**Colo. Rev. Stat. § 6-1-101, *et seq.***
**(On Behalf of the Colorado Multiple NSF Class)**

131.    Plaintiffs incorporate by reference the preceding paragraphs.

132.    Plaintiffs and members of the Colorado Multiple NSF Class are consumers within the meaning of the Colorado Consumer Protection Act ("CCPA").

133.    ENT's conduct, as described herein, constitutes an unfair and deceptive trade practice, as defined in Colo. Rev. Stat. § 6-1-105.  Specifically, ENT unfairly and deceptively

assessed multiple NSF Fees on a single transaction, and failed to inform consumers it would do so.

134.    As an actual and proximate result of Defendant's misconduct, Plaintiffs and the Class were injured and suffered damages by ENT's conduct, including by paying NSF Fees.

135.    ENT is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of All Classes)

139.    Plaintiffs re-allege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.  Plaintiffs will not pursue unjust enrichment if their breach of contract claims survive at the time of trial.

140.    Plaintiffs, on behalf of themselves and the Classes, assert a common law claim for unjust enrichment.

141.    Defendant has requested, received, and retained funds from the Plaintiffs and members of the Classes under such circumstances that in equity and good conscience ENT ought not to retain those funds.

142.    Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Classes.

143.    As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

144.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

145.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits they received and are still receiving, without justification.  Defendant's retention of such funds under the circumstances making it inequitable to do so constitutes unjust enrichment.

146.    The financial benefits derived by Defendant rightfully belong to Plaintiffs and members of the Classes.  Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Classes all wrongful or inequitable proceeds received by them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant traceable to Plaintiffs and the members of the Classes.

147.    Plaintiffs and members of the Classes have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs on their own behalf and on behalf of the Classes respectfully request that the Court:

(a)    Certify this case as a class action, designating Plaintiffs as class representatives and designating the undersigned as Class Counsel;

(b)    Award Plaintiffs and the Classes actual, statutory, and punitive damages in an amount to be proven at trial;

(c)    Award Plaintiffs and the Classes restitution in an amount to be proven at trial;

(d)    Award Plaintiffs and the Classes pre-judgment interest in the amount permitted by law;

(e)     Award Plaintiffs and the Classes attorneys' fees and costs as permitted by law;

(c)     Declare ENT's practices outlined herein to be unlawful and a breach of contract;

(d)     Enjoin ENT from engaging in the practices outlined herein;

(e)     Grant Plaintiffs and the Classes a trial by jury; and

(f)     Granting such other relief as the Court deems just and proper.

Respectfully submitted this 4th day of March, 2019.

By:  */s/ Kelly Hyman*
Kelly Hyman, #51813
**FRANKLIN D. AZAR & ASSOCIATES, P.C.**
14426 East Evans Avenue
Aurora, CO 80014
Telephone: (303) 757-3300
Facsimile: (720) 213-5131
Email: hymank@fdazar.com

Jeffrey Kaliel
Sophia Gold
**KALIEL PLLC**
1875 Connecticut Avenue NW, 10th Floor
Washington, DC 20009
Telephone: (202) 250-4783
Email: jkaliel@kalielpllc.com
Email: sgold@kalielpllc.com

Attorneys for Plaintiffs and the putative Classes

PLAINTIFFS:


Ashley Brymer
131 Amhurst St
Colorado Springs, CO 80911


Stephanie Nelson
7518 Samantha Dr., Apt. 906
Fort Worth, TX 76134

# EXHIBIT A

IMPORTANT ACCOUNT INFORMATION

# Membership and Account Agreement
# Truth-In-Savings
# Electronic Fund Transfers

## Membership And Account Agreement

The following Membership and Account Agreement covers your and our rights and responsibilities in relation to Account(s) offered to you by Ent Credit Union. In all following agreements the words "I," "me," "mine," "my," "your," "you," "they" and "their" mean each and all parties (whether one or more persons) who signs a Membership Account Application/Signature Card ("Signature Card") or has authorized the opening of an account online and completed the funding process. The words "we," "us," "our" and "credit union" mean Ent Credit Union, hereafter referred to as Ent. The word "account" means any one or more share or other accounts you have with Ent. Share accounts and share draft accounts are hereafter referred to as savings and checking.

In signing a Signature Card or completing the online account opening process, each of you, jointly and severally, agree to the terms and conditions in the Membership and Account Agreement, Funds Availability Policy Disclosure, Truth-in-Savings Disclosure, Rate and Fee Schedules, any Account Receipt associated with this Agreement, Electronic Fund Transfer (EFT) Disclosures and the Bylaws and policies of Ent and any amendments of these documents from time to time which collectively govern your Membership and Accounts. The subsequent use of products and services indicates your acceptance of all related agreements and disclosures. You further agree to the acceptance of notices, periodic statements, tax documents and disclosures by means of electronic delivery.

The frequency and conditions that warrant the payment of dividends on all accounts are in accordance with the Bylaws of Ent. Dividends on all accounts are paid as permitted by NCUA Regulation and applicable Colorado law.

FEDERAL LAW PROHIBITS THE GUARANTEE OF DIVIDENDS SINCE DIVIDENDS ARE BASED ON AVAILABLE EARNINGS AT THE END OF A DIVIDEND PERIOD. OUR BOARD OF DIRECTORS DECLARES DIVIDENDS BASED ON CURRENT INCOME AND AVAILABLE EARNINGS OF THE CREDIT UNION AFTER PROVIDING FOR THE REQUIRED RESERVES AT THE END OF A MONTH.

### 1. MEMBERSHIP IN ENT

To be eligible for membership at Ent, you must qualify under our approved field of membership. With a $5 deposit the member will have one share in the ownership of the credit union. Ent is a not-for-profit corporation. If you qualify for membership you may join Ent by completing a Membership Account Application/Signature Card or completing the online account opening process, including funding your account, and maintaining a minimum of $5 in your savings or Money Market Savings account. If you submit a Membership Account Application/Signature Card by mail, please include a check or money order made payable to Ent Credit Union for your initial share purchase. **DO NOT** send cash by mail. You authorize us to check your account, credit and employment history, and obtain a credit report from third parties (including credit reporting agencies) from time to time to verify your eligibility for the accounts, services and products you request or that we may wish to offer you and also in the event that you default on a financial obligation to us. You agree to provide a taxpayer identification number (TIN), to be used for this purpose and subsequent regulatory reporting. Ent may request and you agree to provide additional documentation relative to the type of account or service requested. Accounts, services and products offered to you may be based on information from a credit report. You may request the name and address of each credit-reporting agency from which we obtain a credit report in connection with your account.

### 2. SINGLE PARTY ACCOUNTS

A single party account is an account owned by one member including any individual, corporation, trust or other organization qualified for credit union membership. If the account is a single party account the interest of a deceased individual owner will pass, subject to applicable law, to the descendant's estate or Payable on Death (POD) beneficiary, subject to other provisions of this Agreement governing our protection for honoring transfer and withdrawal requests of an owner or owner's agent prior to notice of an owner's death.

### 3. MULTIPLE PARTY ACCOUNTS

An account owned by two or more persons is a multiple party account. All multiple party accounts are established with rights of survivorship. Exceptions to this are POD designations and Individual Retirement Accounts (IRAs).

A. **Rights of Survivorship.** For a multiple party account with rights of survivorship, upon the death of one of the owners, that person's interest will pass to the surviving owner(s). Right of survivorship arising from the terms of a multiple party account cannot be changed by a Last Will and Testament.

B. **Account Control for Multiple Party Accounts.** Any account owner of a multiple party account is authorized to perform for the additional joint owner(s), and we are authorized to accept orders and instructions pertaining to the account, requests for present and future services, and any transactions from any other account owner. The signature of each owner is guaranteed by the additional account owner(s). Any account owner may withdraw all funds in the account, place a stop payment order on items drawn on the account, transfer funds, pledge (at our discretion) all or any part of the shares of any account without the consent of the other account owner(s) to us and we in turn have no duty in such events to notify the additional account owner(s). Any account owner may add an additional account owner. However, we reserve the right to require written consent of all account owner(s) for a change of ownership or termination of a multiple party account. If we are notified either verbally or in writing of a dispute among the account owners or have received conflicting instructions concerning the account, we may temporarily cease operation of or terminate the account, require a court order enabling proper operation of the account or require that all account owners agree in writing to any and all transactions concerning the account.





(719) 574-1100
800-525-9623
Ent.com

IMPORTANT ACCOUNT INFORMATION

Membership and Account Agreement ▲ Truth-In-Savings ▲ Electronic Fund Transfers

C. **Account Liability for Multiple Party Accounts.** If any item deposited in a multiple party account is returned unpaid, an account is overdrawn or if we do not receive final payment on any transaction, each of the multiple party account owners is jointly, severally and fully liable to us for the amount of the returned item, overdraft or unpaid amount and any charges, regardless of who created the overdraft, deposited or cashed the item or benefited from the transaction. If any account owner is indebted to us, we may enforce our rights against any or all funds in the multiple party account regardless of who contributed the funds to the account, or any account either account owner may have funds in, unless strictly prohibited by law.

D. *POD/Trust Accounts.* A POD or Trust account designation provides that an account so designated is payable to the account owner or owners during their lifetimes, and upon the death of the last account owner, payable to any named and surviving POD or Trust beneficiary or Successor Trustee designated on your Membership Account Application/Signature Card, Affidavit of Trust, or other trust documentation on file with us. If an account is payable to more than one beneficiary the account is jointly owned by such beneficiaries without rights of survivorship. POD or Trust beneficiaries shall not apply to Individual Retirement Accounts (IRAs), which are governed by a separate beneficiary designation. It is not our duty and we shall have no obligation to notify any beneficiary of the existence of any account or the vesting of the beneficiary's interest in any account, except as otherwise provided by law. For any trust account established by a member, we reserve the right to require that the trust must be registered in the state of Colorado and that the trustee(s) will complete "Ent Credit Union Affidavit of Trust" or similar Certificate of Trust. An IRA is a distinct account type and cannot be converted under a trust. Ent will not act as the trustee for any trust unless explicitly authorized by law. Ent, in its sole discretion, has the right to refuse any trust for application for membership or open new accounts under the name of the trust. There may be other formal or informal types of fiduciary accounts that will be governed by court order or applicable laws that may be accepted by us, e.g., Conservator, Guardianship, Estate, Medicaid Income Trusts, KeepSafe Trusts, Social Security, Individual Development and Medical Health Savings Accounts.

E. **Minor Accounts.** For any account established by a minor, we reserve the right to require the minor account to be a multiple party account with a parent, grandparent or legal guardian who shall be jointly, severally and fully liable to us for any returned item, overdraft or unpaid charges or amounts on such accounts. We may make payments of funds directly to the minor without regard to his/her minority. Unless a parent, grandparent or guardian is an owner of the account the parent, grandparent or guardian shall not have any right to access the account. We have no duty to inquire of the use or purpose of any transaction by the minor or any account owners. Ent shall not change the account status when the minor reaches the age of majority unless authorized in writing by all account owners or as provided by law.

F. **Uniform Transfers to Minors Account.** A Uniform Transfer to Minors Account (UTTMA) is an individual account established by a member as a custodian by depositing funds as an irrevocable gift to a minor. The minor to whom the transfer is made is the owner and beneficiary of the account. The custodian has possession and control of the account for the exclusive right and benefit of the minor, and barring a court order otherwise, is the only party entitled to make deposits to, withdrawals from, or close the account. We have no duty to inquire of the use or purpose of any transaction by the custodian. In the event of the custodian's death, we may place an administrative hold on the account, until we receive instructions from any person authorized by law to withdraw funds or a court order authorizing such withdrawal. Account ownership will revert solely to the minor when they attain the age of 21 years old.

G. Signator Designation. A signator designation is an instruction to us that the account owner(s) has authorized another person to make transactions as agent for the account owner(s) regarding the accounts designated. A signer has no ownership in the account or Ent voting rights. We have no duty to inquire of the use or purpose of any transaction by the agent. Signator designation is usually limited to commercial, corporation, business, association or partnership accounts.

H. Business Accounts. Sole proprietorship, partnership, limited liability company, limited liability limited partnership, corporation and unincorporated business association/organization accounts may be opened with appropriate supporting documentation. Ent reserves the right to deny the opening of any type of business account. Principals of a legal entity must be identified and eligible for membership as individuals. Please reference the separate Fee Schedule for Business or Corporate Accounts and additional terms and conditions on our Business/Corporate Deposit Resolution and Agreement, Certification of Beneficial Owners, and Business/Corporate Signature Card.

4. **REQUIREMENTS FOR DEPOSIT OF FUNDS**
Deposit of funds may be made to any account, in any manner approved by us in accordance with applicable laws and regulations.

A. **Endorsements.** At our discretion, you authorize us to accept transfers, checks, drafts, substitute checks (as defined by the Check Clearing for the 21st Century Act, referred to as "Check 21") and other items for deposit into any of your accounts if they are made payable to, or to the order of, any one or more owners on the account, whether or not they are endorsed by all payees. You authorize us to supply missing endorsements of any owners if the credit union chooses to supply such endorsements. If an insurance, government, or other check or draft requires an endorsement as set forth on the back of the check or draft, we may require endorsement as set forth on the item. Endorsements must be placed in the space on the back of the check between the top edge and 1.5 inches from the top edge. If you deposit a substitute check as defined under Check 21, you are providing a warranty that all endorsements provided by you or on your behalf are proper and the item is properly payable and absent of any alteration. We reserve the right to reject any check for deposit which is not properly endorsed, may indicate fraud or alteration or has been stamped in such a manner as to block the credit union's routing and transit number. You agree that we may refuse to accept for deposit or to process any check or other item that is presented in a form that cannot be processed, photographed or imaged with equipment used in our normal operations.

B. **Collection of Items.** We shall not be responsible for deposits made by mail, at an automated teller machine (ATM) or at an unstaffed facility until the credit union actually receives them. We act only as your agent in handling your deposits and assume no responsibility beyond the exercise of ordinary care. We will not be liable for the negligence of any correspondent or for loss in transit and each correspondent will only be liable for its own negligence. We reserve the right to send any item for collection.

C. **Final Payment.** All items or Automatic Clearing House (ACH) transfers credited to your account are provisional and subject to our receipt of final payment. If final payment is not received, we reserve the right to charge your account for the amount of such items or ACH transfers or both and impose a return item charge on your account. If we incur fees to collect any item, we may charge such applicable fees to your account. We reserve the right to refuse or to return all or any item or funds transfer. We shall have the right to charge back against your account all previously deposited items or other negotiable items endorsed by you that



# IMPORTANT ACCOUNT INFORMATION

## Membership and Account Agreement ▲ Truth-In-Savings ▲ Electronic Fund Transfers

are returned to us unpaid, regardless of whether the amount of the item has been available for your use.

**D. Direct Deposits.** We may offer direct deposit options allowing you to pre-authorize deposits (e.g., payroll checks or other government checks) or pre-authorize transfers from other accounts at Ent. You must authorize any direct deposits to your accounts by a separate authorization form. If applicable, a notification of at least thirty (30) days prior to any direct deposit or pre-authorized transfer must be given if you wish to cancel or change the direct deposit or direct transfer option. Upon a filing of bankruptcy, if you fail to cancel any direct deposit authorization, you therefore instruct your employer and us to make and apply direct deposits in accordance with your authorization on file with us. If we are required to reimburse an employer or the U.S. government for any benefit payment directly deposited into your account for any reason, you agree that Ent may deduct the amount returned from any of your accounts, unless prohibited by law.

**E. Crediting of Deposits.** Deposits made after the deposit cutoff time and deposits made on credit union holidays and on days that are not business days at Ent will be credited to your account on the next business day. Deposits received at unstaffed facilities such as night depositories will be credited on the day funds are removed and processed by us. Items drawn on an institution located outside the United States may be handled on a collection basis. Amounts may be provisionally credited to your account until we receive final payment. You waive any notice of nonpayment, dishonor or protest regarding any items purchased or received by us for credit to your account or for collection. You authorize Ent Credit Union to chargeback, or collect from any of your share or deposit account(s), any amounts Ent must pay to another financial institution regarding the processing of an original check. This authorization shall remain in place regardless of the passage of time since the date of deposit. You authorize us to correct any posting errors to your account if the funds were not properly payable to an account owner.

## 5. ACCESS TO CREDIT UNION ACCOUNTS

**A. Authorized Signature.** We must have an authorized signature of yours on a Membership Account Application/Signature Card or an electronic signature, as provided by our online account opening process, to access any account of yours. You authorize us to recognize your signature, but we will not be liable for refusing to honor any item or instruction of yours if we believe, in good faith, that the signature on such item or instruction is not genuine. You may authorize the use of a facsimile signature, but you give us permission to honor any check or draft that appears to bear your facsimile signature even if it was made by an unauthorized person. If you should give your account number or access credentials to a third person and authorize us to accept and honor transactions initiated by the third person, you may not hold us liable if the third person initiates transactions on your account you are not aware of.

**B. Access Options.** You may make withdrawals or transfers from your account by any means permitted by us (e.g., check, ATMs, in person, by mail, automatic transfer, ACH, Internet access or telephone, as applicable). If we accept any check that is not drawn on a form provided by us, you will be responsible for any loss incurred by us for handling the check. We may return as unpaid any check that is not drawn on a form provided by us. We have the right to review, approve or refuse to accept any Power of Attorney and may restrict any withdrawals or transfers on your account.

**C. ACH and Wire Transfers.** You may initiate or receive credits or debits to your account via wire transfer or ACH transfer if that service is provided by us. Electronic presentment of checks you write to a merchant is allowed under ACH regulations. This means that

although you may give a paper check to a merchant, they may present that check for payment electronically via the ACH system. It is the responsibility of the merchant to destroy or return the item under ACH guidelines. You understand and agree that if you receive funds by a wire or ACH transfer, we are not required to notify you at the time the funds are received. The transfer will be shown on your periodic statement. We may provisionally credit your account for an ACH transfer before we receive final settlement for the transfer. You understand and agree that if we do not receive final settlement for an ACH transfer, we may reverse the provisional credit to your account or you will refund the amount to us. When you initiate a wire transfer, you must identify the recipient and any financial institution by name, by account and by identifying number. Ent (and other institutions) may rely on the account or other identifying numbers as the proper identification, even if the information you provide identifies a different party or institution. As part of our security procedures, you authorize us to record telephone conversations related to the processing of wire transfers, transactions, account maintenance and collection of accounts. You authorize Ent to utilize any security procedure it deems necessary prior to completing a wire transfer. Wire transfers are governed by Federal Reserve Regulation J if the transfer is cleared through the Federal Reserve and the Consumer Financial Protection Bureau (CFPB) rule governing foreign remittances. ACH transactions are governed by the rules of the National Automated Clearing House Association. Additional information, including restrictions and liabilities, is outlined in "Ent Credit Union Domestic and International Funds Transfer Agreement and Disclosure."

**D. Examination of Documents.** We may disregard information on any draft or check other than the signature of the drawer, amount of the item and any magnetic encoded information. You understand and agree that we do not fail to exercise ordinary care in paying an item solely because our procedures do not provide for visual examination or presentation of the actual items.

## 6. ACCOUNT PAYMENT OF EARNINGS AND ACCOUNT FEES

Payment of earnings on your account is subject to the account rates and fees, payment and balance requirements as set forth in the related Fee Schedule and Truth-in-Savings Disclosure. We may charge you fees for your accounts and services that the credit union provides. Fees may reduce earnings on an account. Fees and charges that may be assessed against your account are set forth in the Fee Schedule, and you agree that the credit union may change the Fee Schedule at any time at the credit union's sole discretion. You will be notified of such changes as required by law.

## 7. TRANSACTION LIMITATIONS

**A. Restrictions of Withdrawals.** We may permit a withdrawal only if you have sufficient funds available in your account to cover the entire amount of the withdrawal or have an established overdraft protection plan in accordance with our Overdraft Procedures. Checks, transfer orders or payment orders that are drawn against insufficient funds will be subject to a fee, set forth in the Fee Schedule. If there are insufficient funds to cover some but not all of your withdrawal orders, we may allow those withdrawals for which there are sufficient funds, in any order, at our discretion. We may also refuse to allow a withdrawal of funds in other cases; for example: any dispute between the owners about the account (unless a court has ordered us to allow the withdrawal); a legal garnishment or attachment is served; the account secures any obligation to us; any required documentation has not been presented; the withdrawal is prohibited by law or regulation; or you fail to repay an Ent loan on time. You will be advised of the reason(s) for refusal after action is taken, if required by law. You





(719) 574-1100
800-525-9623
Ent.com

IMPORTANT ACCOUNT INFORMATION

Membership and Account Agreement ▲ Truth-In-Savings ▲ Electronic Fund Transfers

accept and agree to follow credit union procedural guidelines developed to ensure the safety and soundness of the credit union by allowing us to limit transactions at our sole discretion that are deemed to be a concentration of funds in the form of a deposit or withdrawal to a member's account which would create the potential to have a significant negative impact on the capital accounts of the credit union. We reserve the right to require members to give notice, in writing, of any intended withdrawals from any account of not less than seven (7) days and up to sixty (60) days in accordance with applicable law before such withdrawal.

B. **Transfer Limitations.** For savings and Money Market Savings accounts, if applicable, you may make up to six (6) pre-authorized, automatic, telephone (including data transmission) or audio response transfers to another account of yours or to a third party during any calendar month. A pre-authorized transfer includes any arrangement with us to pay a third party from the member's account upon oral or written orders, including orders received through the ACH. There is no limit on the number of transactions you may make in the following manner: (1) transfers to any loan account with us and (2) transfers to another credit union account or withdrawals (checks payable and mailed directly to you) when such transfer or withdrawal is initiated in person, by mail or at an ATM. If a transfer request would exceed the transfer limitations set forth above in any statement period, your account will be subject to an excessive transfer fee, account restriction or conversion to a transaction account.

The credit union made a change in the way it reports total checking account balances to the Federal Reserve Bank (FRB). This change will not affect your available balance, dividend earnings, NCUA insurance, statement or any other feature of your checking account.  This will allow us to substantially lower our reserve requirement balance at the FRB and increase the amount of funds available for loans and investments, thereby increasing our ability to serve our members. Checking accounts will now be structured into checking and savings sub-accounts for regulatory accounting purposes, only. The credit union may periodically transfer funds between these two sub-accounts based upon regulatory limitations. Your dividend calculation on both sub-accounts will be the same and receive the dividend rate applicable to your checking account.

C. **Transaction Authorizations.** Authorization holds may reduce the amount available in your account. Ent has no control over the dollar amount and time that a merchant authorization holds your available funds. You agree that we shall not be liable for withholding any authorization. The actual or ledger balance indicates the items that have actually posted to your account but not transactions that have been authorized and are pending. As an example, any purchases, holds, fees, other charges or deposits made on your account that have not yet posted will not appear in your actual or ledger balance. Your available account balance is the amount of money in your account that is available to you to use without incurring a non-sufficient funds (NSF) or courtesy pay (overdraft) fee. The available account balance takes into account things like holds placed on deposits, pending transactions (such as pending debit card purchases) that have been authorized for the merchant but not posted to your account, authorized automatic bill payments and other outstanding transactions that have not posted to your account. This available balance is the balance used to determine if items are subsequently presented against insufficient funds or the amount that would overdraw your account and incur fees. For additional information regarding merchant authorization holds please refer to your Ent Agreement and Disclosure for a Visa® Debit Card or ATM Card for additional information.

**8. OVERDRAFTS**

A. **Overdraft Liability.** If on any day, the available funds in your checking or savings account are not sufficient to cover checks, fees or other items posted to your account, those amounts will be handled in accordance with our overdraft procedures or an overdraft protection plan you have with us. Our determination of an insufficient available account balance may be made at any time between presentation and our midnight deadline (of the same day) with only one review of the account required. We have no duty to notify you of an insufficient funds check or item. Your account will then be subject to a charge for the check or item whether paid or returned and any subsequent overdraft processing costs as set forth in the Fee Schedule. At our discretion, we may pay your account into overdraft subject to applicable fees. Except as otherwise agreed in writing, Ent, by covering any overdraft, does not agree to cover subsequent overdrafts and may discontinue covering overdrafts at any time without notice. If we pay a check, item or impose a fee that would otherwise overdraw your account, you agree to pay the overdrawn amount immediately. We reserve the right to pursue collection of previously dishonored checks or items at any time, including giving a payor bank extra time beyond any midnight deadline limits.

B. **Overdraft Protection Plan.** If we have approved an Overdraft Protection Plan for you, we will honor checks or items drawn on insufficient funds in your account by transferring the necessary funds from another account under this Agreement or a loan account, as you have directed. The fee for overdraft transfers, if any, is set forth in the Fee Schedule. Transfers from an account will be governed by this Agreement. Transfers from a loan account will be governed by the applicable loan agreement. If your account reflects an authorization hold, your credit line may be reduced. This overdraft protection plan will not automatically advance to make loan payment transfers to other Ent loans.

C. **Courtesy Pay (Overdraft) Protection Program.** Ent offers a courtesy pay overdraft protection program which is designed to cover inadvertent overdrafts in an individual's checking account. By signing a signature card or opening your account online, you are enrolling in this type of courtesy pay overdraft program for checks, ACH items and recurring Debit Card transactions posting to your individual checking account(s). If you choose, you can contact us at the telephone number(s) listed herein to opt-in to obtain courtesy pay for ATM and everyday Debit Card transactions. Our determination of an insufficient available account balance may be made at any time between presentation and our midnight deadline (of the same day) with only one review of the account required. This program will pay items for a period of five (5) days up to an aggregate total of $300 applicable to a maximum of ten (10) checks or debit items per month. There are additional qualifications of maintaining your account(s) in good standing. Visit Ent.com for a complete list. Each paid item will be assessed a fee that is equivalent to the fee paid for returning an item as non-sufficient funds. This advance is not a line of credit and must be repaid within thirty (30) days of the account being overdrawn. Members who anticipate overdrawing their account on a recurring basis are encouraged to request a personal line of credit with higher dollar limits based on standard credit qualifications. Ent may restrict the number of accounts offered a Courtesy Pay (Overdraft) Protection Program in its sole discretion. *A member may opt out of the overdraft protection program by contacting us at (719) 574-1100 or 800-525-9623 or P.O. Box 15819, Colorado Springs, CO 80935-5819.* We have the option to increase the courtesy pay aggregate limit to provide additional service to a member as deemed appropriate for the member's account relationship.



(719) 574-1100
800-525-9623
Ent.com

# IMPORTANT ACCOUNT INFORMATION
## Membership and Account Agreement ▲ Truth-In-Savings ▲ Electronic Fund Transfers

D. **Credit Reporting.** If a negative balance in any savings or checking account is not resolved within thirty (30) days, we may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

### 9. POSTDATED AND STALE-DATED DRAFTS
You authorize us to accept and pay any check without regard to the date of the check even if the check is presented for payment before its date. You agree not to deposit checks or other items before they are properly payable. We are under no obligation to you to pay a check drawn on your account that is presented more than six (6) months after its date.

### 10. STOP PAYMENT ORDERS
A. **Stop Payment Request.** You may ask us to stop payment on any check you or any account owner draws upon your Ent account. You may request a stop payment in person, by telephone, online banking or by mail. The stop payment of a check or electronic item will be effective if we receive the order in time for us to act upon the order and you provide accurate information regarding the account number, amount, check number and payee. If you give us incorrect information, we will not be responsible for failing to stop payment on the check. If the stop payment order is not received in time for us to act upon the order, we will not be liable to you or to any other party for payment of the check. If we credit your account after paying a check over a valid and timely stop payment order, you agree to sign a statement describing the dispute with the payee, to transfer all of your rights against the payee or other holders of the check to us, and to assist us in any legal action taken against the payee.

B. **Duration of Order.** A check stop payment request expires six (6) months from the date the request was placed or until canceled by an account holder in writing. If the check is presented electronically as an ACH item, in accordance with the National Automated Clearing House Association (NACHA) electronic check conversion rules, the item will be returned as a stop payment. Should the payee submit the check electronically as a prearranged ACH debit it may be processed. A Written Statement of Unauthorized Debit form must be completed to recover these funds. An ACH stop payment order will remain in effect until the earlier of (1) the withdrawal of the stop payment order by the account owner(s) or (2) the return of a single debit entry or if applied to a specific originator, the return of all debit entries.

C. **Liability.** We may charge a fee for each check for which a stop payment order is requested as set forth in the Fee Schedule. You may not stop payment on any certified check, official check or any other check, draft, or payment guaranteed by us unless the stop payment request is due to a lost or stolen check. You agree that any claim of loss is not enforceable until after the 90th day following the date of the check or its certification. You agree that Ent, at its discretion, may not issue a replacement check until the 90th day. You should be aware that while payment of the item may be stopped, you may remain liable to any person, including Ent, who is a holder of the item despite the stop payment order. You agree to indemnify and hold us harmless from all costs, including attorney's fees, damages or claims related to Ent's action in refusing payment of an item, including claims of any multiple party account owner, payee or endorsee in failing to stop payment of an item as a result of incorrect information provided by you. Under such circumstances, we may require you to purchase an indemnity bond.

### 11. LIABILITY OF ENT
If we do not properly complete a transaction according to this Agreement, Ent will be liable for your losses or damages not to exceed the amount of the transaction, except as otherwise provided by law. We will not be liable if: (a) through no fault of ours, your account does not have enough available funds to make the transaction; (b) circumstances beyond our control prevent the transaction; (c) your loss is caused by your negligence or the negligence of another financial institution; (d) law or regulation prohibits the completion of the transaction; (e) the money in your account is subject to legal process or other claim; or (f) it is necessary to prevent loss to your account or Ent. We will not be liable for consequential damages, except liability for wrongful dishonor. Ent's actions will constitute the exercise of ordinary care if such actions or non-actions are consistent with applicable state law, Federal regulations and (NCUA) Operating Letters, ACH rules and general banking practices followed in the area served by us. You grant us the right, in making payments of deposited funds, to rely exclusively on the form of the account and the terms of this Account Agreement. Any conflict between oral representations by you or our employees and any written form will be resolved by reference to this Agreement and applicable written form.

### 12. CREDIT UNION LIEN, SECURITY INTEREST AND RIGHT OF SET OFF
To the extent you owe us as a borrower, guarantor, endorser or otherwise, we have a lien on any or all of the funds in any account in which you have ownership interest, regardless of the source of funds, unless prohibited by law. You authorize government payments and deposits made to your account can be used for the repayment of any obligation owed to Ent. We may apply these funds in any order to pay off your indebtedness. If we choose not to enforce any such lien, we do not waive our rights to enforce the lien at a later time. In addition, you grant us a consensual security interest in your accounts and agree we may use the funds from your accounts to pay any debt or amount now or hereafter owed us, except for obligations secured by your residence, if prohibited by applicable law. At our discretion, we may exercise our right of set off and apply the funds from any account you are an owner, in any capacity, to pay off your obligations to us. Once you are in default, we may exercise this right without further notice to you.

### 13. LEGAL PROCESS
If any legal action, such as levy, garnishment or attachment, including those issued by the Internal Revenue Service (IRS) or the state of Colorado, is brought against your account, we may refuse to pay out any funds from your account until the dispute is resolved or may pay out funds according to the terms of the levy, garnishment or attachment. You agree to hold us harmless in our response to any legal action. You agree account balances are subject in their entirety to the satisfaction of the court order regardless of the source of funds. If we incur any expenses or attorney's fees in responding to a legal process, such expenses may be charged against your account without prior notice to you, unless prohibited by law. Any legal process against your account is subordinate to Ent's lien and security interests. Ent will comply with federal government and state of Colorado requirements such as Office of Foreign Asset Control (OFAC), USA PATRIOT and Bank Secrecy Acts and any other programs requiring a credit union's involvement.

### 14. ADVERSE CLAIMS
If any person or entity makes a claim against funds in your account, or if the credit union believes that a conflict exists between or among the owners on your account or that there is a dispute over





(719) 574-1100
800-525-9623
Ent.com

I M P O R T A N T   A C C O U N T   I N F O R M A T I O N

Membership and Account Agreement ▲ Truth-In-Savings ▲ Electronic Fund Transfers

matters such as ownership of your account or the authority to withdraw funds from your account, the credit union without any liability to you may take one or more of the following actions:

A. Continue to rely on signature card(s) or online account opening information for your account,

B. Honor the claim upon receipt of evidence satisfactory to the credit union to justify such claim,

C. Freeze all or part of the funds in your account until the dispute is resolved to the credit union's satisfaction,

D. Close your account and send a check for the available balance in your account payable to you or to you and each claimant,

E. Pay the funds to the appropriate court. The credit union may charge your account for any expenses including attorney fees that the credit union may incur.

As part of the credit union's loss prevention program, when the credit union suspects that irregular, unauthorized or unlawful activities may be involved with your account, the credit union may "freeze" (or place a hold on) the balance in your account and in other accounts you maintain with the credit union pending an investigation of such suspected activities. If the credit union freezes your account, the credit union will give any notice as required by law. Additional reporting may be required to law enforcement if the account involves suspected elder abuse.

### 15. NOTICES

A. **Name or Address Changes.** It is your responsibility to notify us of address changes or a legal name change, with supporting documentation. We are only required to attempt to communicate with you at the most recent address you have provided to us. If we receive notification from the U.S. Postal Service that your mail is undeliverable, we may, at our option, change your address on file with us with the information provided by the U.S. Postal Service. We may accept oral notices of a change in address and may require any other notice from you to us be provided in writing. If we attempt to locate you, we may impose a service fee as set forth in the Fee Schedule.

B. **Notice of Amendments.** Except as otherwise prohibited by applicable law, the terms of this Agreement are subject to change at any time at the discretion of Ent. We will notify you of any changes in terms, rates or fees as required by law. By utilizing your account and related services described herein, you agree to amendments to the terms of this Agreement which have been made available to you by mail, electronically on our website or in person. We reserve the right to waive any term in this Agreement. Any such waiver shall not affect our right to enforce any right in the future.

C. **Effect of Notice.** Any written notice you give to us is effective when it is actually received. Any written notice or statement we give you is effective when it is deposited in the U.S. Mail, postage prepaid and addressed to you at your statement mailing address. Electronic notices or statements become effective when we electronically mail them to you or post a notice on our website that information is now available to you. Notice to any one account owner is considered notice to all owners of the account.

### 16. TAXPAYER IDENTIFICATION NUMBERS AND BACKUP WITHHOLDING

A taxpayer identification number (TIN) must be provided at the time of new account opening as a membership application requirement and must remain on the account. The TIN may be in the form of a Social Security number (SSN), Individual Taxpayer Identification number (ITIN) or an Employer Identification number (EIN). In the

event that an applicant provides documentation that a TIN request has been submitted to the appropriate federal agency, a non-dividend-bearing savings account may be opened, at the discretion of the credit union, with no other credit union services provided, until such time when the TIN is provided to the credit union. The TIN must be provided to us within sixty (60) days. Canadian Nationals may provide us with their Social Insurance number and complete a W-8BEN. A foreign resident's dividends are subject to reporting to the IRS. If your account is or becomes subject to backup withholding, Ent is required by law to withhold and pay to the IRS a required percentage of payments of dividends, interest and other payments under certain conditions. Your failure to furnish a correct TIN or meet other applicable requirements may result in backup withholding or termination of your account.

### 17. STATEMENTS

A. **Contents.** If we provide a periodic statement for your account, you will receive a periodic statement of transactions and activity on your account during the statement period as required by applicable law. If a periodic statement is provided, you agree that only one statement is necessary for a multiple party, business or corporate account. For checking accounts, you understand and agree that when paid, your original check becomes the property of Ent and may not be returned to you, but copies or images may be retained by us or a payable through financial institution and made available upon your request. Applicable charges for this service are listed in the Fee Schedule. You understand and agree that statements are made available to you on the date they are mailed to you or provided (posted) electronically. You also understand and agree that checks or copies thereof are made available to you on the date the statement is mailed or sent to you (to include electronic delivery) even if the checks do not accompany the statement. Please reference the appropriate Fee Schedule for charges assessed for receiving statements by mail and/or additional statement copies.

B. **Examination.** You are responsible for examining each statement and reporting any irregularities to us. We will not be responsible for any forged, altered or unauthorized checks or items drawn on your account if (1) you fail to notify us within forty (40) days of the mailing or electronic delivery date of the first statement received regarding any forgery, alteration or unauthorized signature on any check or item described in the statement, or (2) any checks or items are forged or altered in a manner not detectable by a reasonable person, including the unauthorized use of a facsimile signature.

C. **Notice to Credit Union.** You agree that our retention of checks does not alter or waive your responsibility to examine your statements or the time limit for notifying us of any errors. The statement will be considered correct for all purposes and we will not be liable for any payment made or charge to your account unless you notify us in writing within the above time limits.

D. **Delivery.** You agree to the acceptance of notices, periodic statements and disclosures by means of electronic delivery. Statements and disclosures received through electronic means should be printed, reviewed and retained by you.

### 18. INACTIVE ACCOUNTS

If you have not made a withdrawal from, deposit to, or transfer involving your account for more than the period specified in the Fee Schedule, we may classify your account as an inactive account. Unless prohibited by applicable law, we may charge a service fee for continuing to process your inactive account as set forth in the Fee Schedule. You authorize us to transfer funds from another




account of yours to cover any service fees, if applicable. To the extent allowed by law, we reserve the right to transfer the account funds to an account payable and to suspend any further account statements. If a deposit or withdrawal has not been made on the account and we have had no other sufficient contact with you within the period specified by state law, the account will be presumed to be abandoned. Funds in abandoned accounts will be reported and remitted in accordance with state law. Once funds have been turned over to the state, we have no further liability to you for such funds, and if you choose to reclaim such funds you must apply to the appropriate state agency.

### 19. SPECIAL ACCOUNT INSTRUCTIONS

You may request us to facilitate certain trust, will or court-ordered account arrangements. However, because we do not provide legal advice, we cannot counsel you as to which account arrangement most appropriately meets the specific requirements of your trust, will or court order. If you ask us to follow any instructions that we believe might expose us to claims, lawsuits, expenses, liabilities or damages, whether directly or indirectly, we may refuse to follow your instructions or may require you to indemnify us or post a bond or provide other protection. Account changes requested by you, or any account owner, such as adding or closing an account or service, must be evidenced by a signed form and appropriate documentation that is acceptable to us.

### 20. TERMINATION OF ACCOUNT

We may terminate your account at any time without notice to you or may require you to close your account and apply for a new account if: (a) there is a change in owners or authorized signers; (b) there has been a forgery or fraud reported or committed involving you or your account; (c) there is a dispute as to the ownership of the funds in the account; (d) any checks are lost or stolen; (e) there are excessive returned unpaid items not covered by an overdraft protection plan; (f) there has been any misrepresentation or any other abuse of any of your accounts; (g) false or inaccurate information has been provided to obtain an account or related services; (h) the account has been utilized to conduct illegal transactions; (i) continuation of the account is prohibited by law or regulation; (j) you have physically touched, threatened, made profane or offensive gestures toward, or made profane or slanderous statements to credit union employees or volunteers; or (k) we reasonably deem it necessary to prevent a loss to Ent. You may terminate an account at any time by notifying us in writing. We are not responsible for payment of any check, withdrawal or other item after your account is terminated. If we pay an item after account termination, you agree to reimburse us for such payment.

### 21. TERMINATION OF MEMBERSHIP

You may terminate your membership at Ent after giving notice of your intent to withdraw from membership. You may be denied services or expelled from membership for any reason allowed by applicable law, including causing a loss to Ent, providing false or inaccurate information to obtain an account, or failure to maintain the minimum share balance.

### 22. DEATH OF ACCOUNT OWNER

Under normal circumstances, we may continue to honor all transfers, withdrawals, deposits, checks and other transactions on the account until we are notified of an account owner's death. Once we are notified of an account owner's death, we may pay checks or honor other payments or transfer orders authorized by the deceased member for a period of ten (10) days unless we receive instructions

from any person claiming an interest in the account to stop payment on checks or other items. You agree we can require an indemnity from anyone who claims the funds in your account after your death for any losses suffered by Ent resulting from honoring that claim. This Agreement is binding upon any heir(s) or legal representative(s) of any account owner.

### 23. SEVERABILITY

In the event that any portion of this Agreement is held by a court to be invalid or unenforceable for any reason, the remainder of this Agreement shall not be invalid or unenforceable and will continue in full force and effect. All headings are intended for reference only and are not to be construed as part of the Agreement. Any financial service provided by Ent may be used for any transaction permitted by law. I agree that illegal use of any financial service will be deemed an action of default and/or breach of contract and such service and/or other related services may be terminated at our discretion. I further agree, should illegal use occur, to waive the right to bring legal action against Ent for such illegal activity directly or indirectly related to it. I also agree to indemnify and hold Ent harmless from any suits or other legal action or liability, directly or indirectly, resulting from such illegal use.

### 24. ENFORCEMENT

You agree to be liable to us for any loss, cost or expense that we incur as a result of your failure to comply with this Agreement. You authorize us to deduct any such loss, costs or expenses from your account without prior notice to you. If you are in breach of this Agreement or any other loan or service agreement with us or we suspect fraudulent activity on your account, we may without prior notice restrict access to your accounts or suspend your electronic services or access devices, including ATM or debit cards, online or mobile banking services and deposit or withdrawal functionality. Such restrictions may continue until you cure any breach condition or any fraud condition is resolved. In the event Ent brings a legal action to enforce the Agreement or collect any amount due under this Agreement, we shall be entitled, subject to applicable law, to payment of reasonable attorney's fees and costs, including fees on any appeal, bankruptcy proceedings and any post-judgment collection actions. All accounts are non-assignable and non-transferable by member to third parties. We may use the services of third parties to assist in the collection of any indebtedness owed to the credit union. You agree that we may contact you by home/work/cell phone or email to offer products and services or assist in the collection of an account.

### 25. GOVERNING LAW

This Agreement is governed by the Bylaws of Ent Credit Union, federal laws and regulations, regulations of the state in which Ent's main office is located (Colorado), and local ACH rules, all as amended from time to time. To the extent permitted by applicable law, you agree that any legal action regarding this Agreement shall be brought in the state and country in which we are located. Ent will comply with federal government and state of Colorado requirements such as Office of Foreign Asset Control (OFAC), USA PATRIOT and Bank Secrecy Acts and any other programs requiring a credit union's involvement.



## IMPORTANT ACCOUNT INFORMATION

### Membership and Account Agreement ▲ Truth-In-Savings ▲ Electronic Fund Transfers

## Truth-In-Savings

**SAVINGS, CHECKING, HEALTH SAVINGS, MONEY MARKET SAVINGS, IRA SAVINGS, COVERDELL EDUCATION SAVINGS**

**Rate Information:** See current rate sheet that is available upon request at Ent.com. The dividend rate and Annual Percentage Yield on your account may change at any time. At the direction of this credit union's Board of Directors, the dividend rate may change without limitation to a maximum or minimum level. The Annual Percentage Yield is a percentage rate that reflects the total amount of dividends to be paid on an account based on the dividend rate and frequency of compounding for an annual period. Fees may reduce earnings.

**Nature Of Dividends:** Dividends are paid from current income and available earnings after required transfers to reserves have been made at the end of the dividend period. The dividend rates and Annual Percentage Yields are the prospective rates and yields that we anticipate paying for the applicable dividend period.

### 1. SAVINGS (Share)

**Compounding And Crediting:** Dividends will be computed daily and credited monthly. The dividend period begins on the first calendar day of the dividend period and ends on the last day of the dividend period. Dividends are paid on the last day of the dividend period.

**Balance Information:** The minimum balance required to open a savings account is $5.

**Balance Computation Method:** Dividends are calculated by the Daily Balance Method, which applies a daily periodic rate to the principal balance in the account at the end of each day. Dividends will begin to accrue on the business day you deposit cash and noncash items.

**Fees:** The savings account has no minimum balance fee. Any other fees related to the use of this account (including automated teller machine (ATM) or inactive fees, etc.) are detailed in the Fee Schedule, which is accessible to all members upon request.

**Transaction Limitations:** For a savings account, no more than six (6) pre-authorized, automatic or telephone transfers may be made from this account to another account of yours or to a third party in any month (ATM transactions are excluded from these limitations). Transactions that exceed this limitation are subject to a monthly excessive transfer fee and account restriction.

### 2. CHECKING (Dividend Earning)

**Compounding And Crediting:** Dividends will be computed daily and credited monthly. The dividend period begins on the first calendar day of the dividend period and ends on the last day of the dividend period. Dividends are paid on the last day of the dividend period.

**Balance Information:** There is no minimum balance required to open a dividend-earning checking account. Any account that remains at a zero balance or less for a period of thirty (30) days is subject to closure by the credit union.

**Balance Computation Method:** Dividends are calculated by the Daily Balance Method, which applies a daily periodic rate to the principal balance in the account at the end of each day. Dividends will begin to accrue on the business day you deposit cash and noncash items.

**Fees:** The checking account has a monthly minimum balance fee. If your average daily balance is below $500 a fee will be assessed. Any other fees related to the use of this account (including ATM, check printing, stop payment orders, insufficient check charges, courtesy pay or inactive fees, etc.) are detailed in the Fee Schedule, which is available to all members upon request.

**Transaction Limitations:** Deposit and withdrawal limitations exist when accessing this account by an ATM or Visa® Debit Card. (Reference your Visa® Debit Card or ATM Card Agreement and Disclosure for specific details.)

### CHECKING (Non-Dividend Earning)

**Balance Information:** There is no minimum balance required to open a non-dividend earning free checking account. This account does not pay dividends on any outstanding balance. Any account that remains at a zero balance or less for a period of thirty (30) days is subject to closure by the credit union.

**Fees:** The checking account has no minimum balance fee. Any other fees related to the use of this account (including ATM, check printing, stop payment orders, insufficient check charges, courtesy pay or inactive fees, etc.) are detailed in the Fee Schedule, which is available to all members upon request.

**Transaction Limitations:** Deposit and withdrawal limitations exist when accessing this account by an ATM or Visa® Debit Card. (Reference your Visa® Debit Card or ATM Card Agreement and Disclosure for specific details.)

### 3. HEALTH SAVINGS ACCOUNT (Dividend Earning Checking)

**Compounding And Crediting:** Dividends will be computed daily and credited monthly. The dividend period begins on the first calendar day of the dividend period and ends on the last day of the dividend period. Dividends are paid on the last day of the dividend period.

**Balance Information:** There is no minimum balance required to open this dividend earning checking account. Any account that remains at a zero balance or less for a period of thirty (30) days is subject to closure by the credit union. This is a tiered rate account. Please reference Ent.com or visit one of our service centers for current rate information.

**Balance Computation Method:** Dividends are calculated by the Daily Balance Method that applies a daily periodic rate to the principal balance in the account at the end of each day. Dividends will begin to accrue on the business day you deposit cash and noncash items.

**Fees:** This checking account has no monthly minimum balance fee. Any other fees related to the use of this account (including ATM, check printing, stop payment orders, insufficient check charges or inactive fees, etc.) are detailed in the Fee Schedule, which is available to all members upon request. Any other fees that are charged related to Health Savings Accounts may be posted to the member's savings or non-HSA regular checking account to ensure accurate year-end reporting.

**Transaction Limitations:** Deposits for any taxable year cannot exceed limits prescribed by the Department of the Treasury and the Internal Revenue Service (IRS). Courtesy pay, overdraft programs and automatic account transfers will not be available for Health Savings Accounts. Withdrawal limitations exist when accessing this account by a Visa® Debit Card. (Reference your Visa® Debit Card/ATM Card Agreement or Electronic Funds Transfer disclosure for specific details.)

### 4. MONEY MARKET SAVINGS

**Compounding And Crediting:** Dividends will be compounded daily and credited monthly. The dividend period begins on the first calendar day of the dividend period and ends on the last day of the dividend period. Dividends are paid on the last day of the dividend period.

**Balance Information:** The Money Market Savings is a tiered rate account. The minimum balance required to open a Money Market Savings account is $2,500.

I M P O R T A N T   A C C O U N T   I N F O R M A T I O N

## Membership and Account Agreement ▲ Truth-In-Savings ▲ Electronic Fund Transfers

**Balance Computation Method:** Dividends are calculated by the Daily Balance Method, which applies a daily periodic rate to the principal balance in the account at the end of each day. Dividends will begin to accrue on the business day you deposit cash and noncash items.

**Fees:** The Money Market Savings account has no minimum balance fee. Any other fees related to the use of this account (including ATM or inactive fees, etc.) are detailed in the Fee Schedule, which is available to all members upon request.

**Transaction Limitations:** For a Money Market Savings account, no more than six (6) pre-authorized, automatic or telephone transfers (including data transmission) may be made from this account to another account of yours or to a third party in any month. ATM transactions are excluded from these limitations. Transactions that exceed this limitation are subject to a monthly excessive transfer fee and account restriction.

### 5. INDIVIDUAL RETIREMENT SAVINGS ACCOUNT/COVERDELL EDUCATION SAVINGS

**Compounding And Crediting:** Dividends will be computed daily and credited monthly. The dividend period begins on the first calendar day of the dividend period and ends on the last day of the dividend period. Dividends are paid on the last day of the dividend period.

**Balance Computation Method:** Dividends are calculated by the Daily Balance Method, which applies a daily periodic rate to the principal balance in the account at the end of each day. Dividends will begin to accrue on the business day you deposit cash and noncash items.

**Balance Information:** This account is a tiered rate account. The minimum balance required to open is $5.

**Fees:** This account has no minimum balance fee. Penalties imposed by the IRS may apply.

**Transaction Limitations:** Any withdrawals on IRA accounts are subject to IRS limitations and/or penalties. Contributions are limited by IRS guidelines for the maximum dollar amount per year for wage earners and non-wage earning spouses. Please consult a tax advisor.

### 6. MY SAVINGS STARTER CERTIFICATES

**Compounding And Crediting:** Dividends are computed on a Simple Interest Basis and paid at maturity.

**Balance Computation Method:** Dividends are calculated by the Daily Balance Method, which applies a daily periodic rate to the principal balance in the account at the end of each day. Dividends will begin to accrue on the business day you deposit cash and noncash items.

**Balance Information:** The minimum balance required to open a Certificate account is $25. At maturity, we will follow your instructions to either transfer the funds to another account of yours or mail a check to you. In the absence of instructions, we will transfer these funds to your savings account. At the Certificate annual renewal time, if all of the funds have been either transferred to another account or delivered to you and the Certificate account remains inactive for a period of thirty (30) days thereafter, the account may be closed due to inactivity.

**Renewal:** The Certificate is designed to allow you to choose your maturity date to save for special events. You may choose a maturity/renewal date between six (6) months and one (1) year from the date of opening. This certificate will automatically renew at the prevailing rate and term until you instruct us to close this product. Any automatic transfers that you have set up on this account will continue into each renewal period, unless you withdraw your transfer authorization in writing.

**Fees:** There are no direct fees related to the use of this account. Any other fees related to the use of this account are detailed in the Fee Schedule, which is available to all members upon request.

**Penalties:** The penalty you incur for closing this account prior to maturity is the loss of all accrued dividends.

**Transaction Limitations:** After your account is opened, you may add funds to your account at any time and in any amount. You may not make any withdrawals from your Certificate without closing the account.

We offer various types of priority, special or promotional certificate products that are subject to the terms of the Certificate Agreement. For minimum balance requirements please reference published Rate Sheet. Please reference Certificates/IRA Accounts below for additional information.

### 7. CERTIFICATES/IRA ACCOUNTS

**Rate Information:** The dividend rate and Annual Percentage Yield on certificates offered may change at any time. At the direction of this credit union's Board of Directors, the dividend rate may change without limitation to a maximum or minimum level. The Annual Percentage Yield is a percentage rate that reflects the total amount of dividends to be paid on an account based on the dividend rate and frequency of compounding for an annual period. Dividend rates and Annual Percentage Yields are normally fixed and will be in effect for the term of the account. Any certificate offered by us is subject to the terms of the Certificate Agreement, change or renewal notice, and the specific terms set forth for each account. The Annual Percentage Yield is based on the assumption that dividends will remain on deposit until maturity. Any withdrawal would result in a reduction of earnings. Rates vary by term and product. Current rate information is available upon request at Ent.com.

**Nature Of Dividends:** Dividends are paid from current income and available earnings after required transfers to reserves have been made at the end of the dividend period. The dividend rates and Annual Percentage Yields are the prospective rates and yields that Ent anticipates paying for the applicable dividend period.

**Compounding And Crediting:** Dividends will be compounded and credited monthly. The dividend period begins on the first calendar day of the dividend period and ends on the last day of the dividend period. Dividends are paid on the last day of the dividend period.

**Balance Computation Method:** Dividends are calculated by the Daily Balance Method, which applies a daily periodic rate to the principal balance in the account at the end of each day. Dividends will begin to accrue on the business day you deposit cash and noncash items.

**Balance Information:** The minimum balance required to open a certificate or an IRA certificate is $500.

**Fees:** There are no fees related to the use of this account.

**Transaction Limitations:** After your certificate account is opened, you may not add funds to your account, but you may make withdrawals of dividends from your account. Dividends withdrawn from IRAs before age 59½ may be subject to IRS penalties.

**Maturity:** Your account will mature at the end of the term or at the maturity date set forth on your certificate, account receipt or renewal notice. At maturity, all accounts are automatically renewable for an identical term at the current appropriate dividend rate. Exceptions will be specifically stated on your certificate or disclosed on the renewal notice. You will have six (6) calendar days after the maturity date to withdraw funds without penalty.

**Penalties:** We may impose a penalty if you withdraw any of the principal before the maturity date or the renewal date. For certificates and IRA certificates with maturity of one (1) year or less, the amount of the early withdrawal penalty is ninety (90) days' loss of dividends. For certificates and IRA certificates with maturity in excess of one (1) year but less than seven (7) years, the amount of the early withdrawal penalty is one hundred eighty (180) days' loss



IMPORTANT ACCOUNT INFORMATION

Membership and Account Agreement ▲ Truth-In-Savings ▲ Electronic Fund Transfers

of dividends. For certificates and IRA certificates with a maturity of 84 (eighty-four) months or seven (7) years the early withdrawal penalty is three hundred sixty-five (365) days' loss of dividends. The penalty is calculated as a forfeiture of part of the dividends that have been or would be earned on the account. It applies whether or not the dividends have been earned. If the account has not yet earned enough dividends, the penalty will be all dividends earned with the remaining portion deducted from the principal.

FEDERAL LAW PROHIBITS THE GUARANTEE OF DIVIDENDS SINCE DIVIDENDS ARE BASED ON AVAILABLE EARNINGS AT THE END OF THE DIVIDEND PERIOD.

## Electronic Fund Transfers
## Your Rights And Responsibilities

The following information details your rights and responsibilities under laws governing Electronic Fund Transfers (EFT) as they apply to your accounts at the credit union that are established primarily for personal, family or household purposes. Please read this disclosure carefully to be familiar with your rights and responsibilities for EFT transactions. It is important to retain this notice for future reference.

**TYPES OF ELECTRONIC FUND TRANSFERS**

Electronic Check Conversion/Electronic Returned Check Fees. If you pay for something with a check you may be authorizing your check to be converted to an EFT. You will also be authorizing the payee or third party to electronically debit your account for fees assessed on any unpaid or returned check(s) or item(s). You are considered to have authorized these EFTs if you complete the transaction after being told (orally or by a notice posted or sent to you) that the check(s), item(s) or fees may be processed electronically or if you sign a written authorization.

Direct Deposits. You may make arrangements for certain direct deposits to be accepted into your checking or savings account(s). Often direct deposits are processed through an Automated Clearing House (ACH) network that was pre-authorized by you. Examples of direct deposits include paychecks, Social Security and other government benefits, allotments, retirement benefits and dividends.

Pre-authorized Withdrawals. You may make arrangements to pay certain recurring bills from your checking or savings account(s). Pre-authorized payments from your account can include, but are not limited to, insurance company premiums, installment loan payments to other financial institutions or utility payments. Pre-authorized transfers from savings accounts are further limited to six (6) per month.

Telephone Transfers. You may access your account by telephone 24 hours a day, seven (7) days a week, by calling (719) 591-7717 or out of state toll free 800-441-4882 by using your personal identification number (PIN), a touch tone phone and your account numbers to:

• transfer funds from savings accounts to checking accounts (limit six per month);
• transfer funds to make loan payments; or
• obtain account information.

ATM Access Cards. The types of transactions and dollar limitations are set by the financial institution that owns the actual automated teller machine (ATM) and/or the servicing network with which it is linked. You may access your account(s) through an ATM by using a card with ATM access capabilities and inputting your PIN to:

• make withdrawals from your savings or checking account(s);
• make deposits into your savings or checking account(s) (at participating ATM locations);

• transfer funds between savings and checking account(s); and
• obtain balances on your savings or checking account(s).

ATM/Debit Cards. You may perform the functions listed under ATM Access Cards. In addition, you may use your debit card to access your checking account to purchase goods, pay for services, and obtain cash advances from participating merchants and financial institutions. The online dollar limitation for cash advances using your debit cards must not exceed $505 per business day.

Accounts Using Cards and/or PINs. You cannot use the card and/or PIN to transfer money into or out of your account until we have validated it. If you do not want the use of the card, please destroy it by cutting it in half and notifying us immediately. Your PIN is issued for security purposes. It should remain confidential and not be disclosed to a third party.

Electronic Services. Ent provides online banking, mobile banking, telephone banking and other electronic services such as online bill payment. Information and disclosures on electronic services are made available to you at Ent.com or by asking a Member Service Representative.

Shared Service Centers. Ent account owners may perform limited transactions at other licensed credit union service centers.

**CHARGES FOR ELECTRONIC FUND TRANSFERS**

• We do not charge for direct deposits to any type of account(s).
• We do not charge for pre-authorized withdrawals from any type of account(s).
• We do not charge for transactions or inquiries performed through the audio teller.

Charges associated with the use of your ATM or debit card are listed in the Fee Schedule. When using an ATM that is not owned or operated by Ent you may be charged a "foreign" ATM fee or out-of-network fee. Ent has no control over these charges and they are charged to you at the time of withdrawal. You will be given the option to stop the transaction by not accepting these charges assessed to you by the owner/operator of the ATM. Charges associated with transactions at shared service centers or related to account activity are included in our Fee Schedule.

**BUSINESS DAY DISCLOSURE**

Our business days are Monday through Friday. Saturdays, Sundays and federal holidays are excluded.

**RIGHT TO DOCUMENTATION**

Direct Deposits. If you have arranged to have direct deposits made to your account at least once every sixty (60) days from the same person or company, you can call us at (719) 574-1100, 800-525-9623 or use telephone or online banking to verify the deposit has been made.

Terminal Transfers. You can obtain a receipt at the time you make any transfer to or from your account(s) using an ATM.

Periodic Statements. You will get a monthly account statement from us for your checking account(s). You will get an account statement from us for your savings account(s) on a periodic basis to reflect all transfers made to your account.

**RIGHT TO STOP PAYMENT**

Right to Stop Payment and Procedure for Doing So. If you have told us in advance to make regular payments out of your account, you can stop any of these payments by calling or writing us at the telephone numbers or address listed in this disclosure in time for us to receive your request three (3) business days or more before the payment is scheduled to be made. You may also stop payment on an item(s) via

(719) 574-1100
800-525-9623
Ent.com



## IMPORTANT ACCOUNT INFORMATION

### Membership and Account Agreement ▲ Truth-In-Savings ▲ Electronic Fund Transfers

Internet access. Please refer to our Fee Schedule for the amount we will charge you for each stop payment order you give.

**Notice of Varying Amounts.** If these regular payments may vary in amount, the person you are going to pay will tell you ten (10) days before each payment, when it will be made and how much it will be. (You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)

**Liability for Failure to Stop Payment of Pre-authorized Transfer.** If you order us to stop one of these payments three (3) business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

### OUR LIABILITY

**Liability for Failure to Make Transfers.** If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will NOT be liable to you under certain circumstances, including without limitation, the following:

- through no fault of ours, you do not have enough funds available in your account to make the transfer;
- the transfer would exceed the credit limit on your line of credit;
- the ATM where you are requesting cash does not have enough cash;
- the terminal or system was not working properly and you knew about the breakdown when you started the transfer;
- your Visa® Debit Card or ATM Card is retrieved or retained by the ATM;
- your card or PIN has been lost or stolen and we have blocked the account;
- circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions we have taken;
- your account is in default;
- the funds are subject to legal process or other encumbrance restricting such transfer;
- account ownership cannot be verified by switch network;
- we are unable to properly verify that the transaction was authorized by you; or
- Federal regulations prohibit the processing of the transaction.

### SUSPENSION OF EFT ACCESS OR SERVICE

If you are in breach of this Agreement or any other loan or service agreement with us or we suspect fraudulent activity on your account, we may without prior notice restrict access to your accounts or suspend your electronic services or access devices, including ATM or debit cards and online or mobile banking services. Such restrictions may continue until you cure any breach condition or any fraud condition is resolved.

### DISCLOSURE OF ACCOUNT INFORMATION TO THIRD PARTIES

We will disclose information to third parties about your account or the transfers you make:

- where it is necessary for completing transfers;
- in order to verify the existence and condition of your account for a third party, such as a credit reporting agency or merchant;
- in order to comply with government agency or court orders; or
- if you give us written permission.

### UNAUTHORIZED USE

Telephone us at once, if you believe your card and/or PIN has been lost or stolen, your PIN compromised, or if an EFT has been made without your permission using information from your card or check. Telephoning is the best way of keeping your possible losses to a minimum. Your prompt notification will allow us to protect your account as well as the credit union. If your statement shows transfers that you did not make, tell us at once. If you do not tell us within sixty (60) days after the statement was mailed or provided to you, you may not get back any money you lost after the sixty (60) days, if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we may extend the time periods. If you believe your card and/or PIN has been lost or stolen or that someone has transferred or may transfer money from your account without your permission, call or write us at the telephone numbers or address listed in this disclosure.

### ERROR RESOLUTION

In case of errors or questions about your electronic transfers, call or write us at the telephone numbers or address listed in this disclosure, as soon as you can, if you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared. If the transaction is a foreign remittance, we must hear from you no later than one hundred eighty (180) days after the transaction appeared on your statement. You must notify us of the following:

1) Your name and account number.
2) The error or the transfer you are unsure about, and explain as clearly as possible why you believe it is an error or why you need more information.
3) The dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within ten (10) business days. We will determine whether an error has occurred within ten (10) business days after notification and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. If we decide to undertake additional investigation, we will provisionally credit your account within ten (10) business days (twenty (20) business days if your account has been open for thirty (30) days or less) for the amount you think is in error. This provisional credit enables you to have the use of the funds during the time it takes us to complete our investigation. If the error concerns an electronic transfer that is (1) a foreign-initiated transaction, (2) point-of-sale debit card transaction or (3) a transaction occurring within the first thirty (30) days after a deposit to a new account, a ninety (90) day investigation period in place of forty-five (45) days will apply. Please note that if we ask you to put your complaint or question in writing and we do not receive it within ten (10) business days after our request, we may not credit your account. We will tell you the results within three (3) business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

Please direct inquiries or questions to:

Ent Credit Union
P.O. BOX 15819
Colorado Springs, CO 80935-5819
Telephone: (719) 574-1100 or 800-525-9623

---

 Equal Housing Lender | Equal Opportunity Lender | Federally Insured by NCUA | © Ent Credit Union, 2018          Rev. 5/18



EXHIBIT B

PERSONAL BANKING

# Fee Schedule

## Savings and Checking Accounts

| | |
|---|---|
| Account Printout | $1.50 |
| Research/Reconciliation (per hour) ½ hour minimum | $15.00 |
| Verification of Account/Deposit (VOD) | $10.00 |
| Closed Account Fee (account closed within 90 days – per Share ID) | $10.00 |
| Reopen Share Account (within 6 months of closing) | $10.00 |
| Inactive Account Maintenance Fee (1 year no activity) | $5.00/month |
| Deposited Item Return Fee | $5.00 |
| Non-Sufficient Funds (NSF Item*) | $30.00 |
| Courtesy Pay (Overdraft) item* paid | $30.00 |
| Stop Payment | $25.00 |
| Check Copies (per item. Does not apply to substitute checks.) | $1.00 |
| Temporary Checks (per sheet/4 checks per sheet) | $1.00 |
| ValuePLUS Checking Fee (if average daily balance falls below $500) | $5.00/month |
| Check Printing | Varies by style |
| Excessive Transfers Fee (Reg. D) | $10.00/month |

*Check, substitute check, or electronic item.

## Safe Boxes

| | |
|---|---|
| 3" x 5" x 24" | $15.00 annual |
| 5" x 5" x 24" | $25.00 annual |
| 3" x 10" x 24" | $30.00 annual |
| 5" x 10" x 24" | $45.00 annual |
| 6" x 10" x 24" | $50.00 annual |
| 7" x 10" x 24" | $55.00 annual |
| 10" x 10" x 24" | $65.00 annual |
| Drill Fee | Third-party Service Provider Fees Apply |
| Lost Key Fee (per key) | $10.00 |

Not all box sizes available at all locations. The contents of Safe Boxes are not NCUA insured.

## ATM and Visa® Debit Card Transactions

| | |
|---|---|
| Visa Debit Card, ATM Access Card | No Annual Fee |
| Replacement Card (ATM Access Card, Visa Debit Card) | 1 Free/year** |
| Lost/Stolen Card Replacement | 1 Free/year** |
| Charge-Back Fee | $6.00 |
| Copy of Sales Draft – Visa Debit Card | $4.00 |
| Rush Card – ATM, Visa Debit | $50.00 |
| Card Research (per hour) ½ hour minimum | $15.00 |
| Non-CO-OP® Network Member ATM Transaction Fee | $1.50‡ |
| Visa Foreign Currency Transaction Fee | 1.00% |

**After the first card replacement, the charge is $5.00
‡Does not include surcharge imposed by the owner (other than Ent) of the ATM.

## Miscellaneous Transactions

| | |
|---|---|
| Electronic (eStatements) Statement Service Fee | Free/month |
| Additional Copy of Statement (per statement) | $2.00 |
| Outgoing Wire Transfer – Domestic | $25.00 |
| Outgoing Wire Transfer – International | $55.00 |
| Wire Transfer – International Amendments (tracers) | $15.00 |
| Returned Mail: Address Search (per statement) | $3.00 |
| Notary Fee (member) | None |
| Photocopy Fee (per page) | $0.20 |
| Levies/Garnishments | $100.00 |
| Coupon Redemption (per envelope) | $15.00 collection fee |
| Skip-A-Pay Fee | $20.00 |
| Consumer Loan Payment Late Charge (assessed after 10 days) | $15.00 |
| Loan Payment Coupon Book (annual) | $25.00 |
| Home Equity Modification Fee | $100.00 |
| Home Equity Subordination Fee | $100.00 |
| Shared Service Network Usage Fee  Outside Colorado Springs  In Colorado Springs  *Service provider may charge additional fees.* | 6 Free/month, $2.00 each thereafter $2.00/transaction |
| Abandoned Property Processing | The lesser of 2% or $25 |

## Negotiable Items

| | |
|---|---|
| Official Checks | $3.00 |
| Merchant Check Exchange (per item) | $30.00 |
| Money Orders | $3.00 |
| Collection Fee – Incoming/Outgoing | $15.00 |
| Collection Fee – Incoming (from another financial institution) | $40.00 |

## Thank you for choosing Ent.®

We appreciate your choice of Ent Credit Union for your financial business. That's why, depending on your account relationship, some of the fees on this schedule may be waived.




NCUA  Equal Housing Opportunity | Equal Opportunity Lender | Insured by NCUA | © Ent Credit Union, 2019                    Rev. 2/19

(719) 574-1100
800-525-9623
Ent.com

